UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| BRADFORD SKINNER, | ) </br> ) </br> ) |
| Plaintiff, | ) |
| v. | ) No. 20-cv-00595-SDD-SDJ |
| LOUISIANA WORKFORCE, L.L.C., *et al.* </br> Defendants. | ) </br> ) </br> ) </br> ) |

**Opposition to Sheriff Gautreaux's Motion to Dismiss**

In April 2020, Plaintiff Bradford Skinner was detained at the East Baton Rouge Work Release facility. He began experiencing chest pain and shortness of breath, and was afraid that he might have contracted COVID-19. He asked for medical care. Sheriff's Office Deputy Demarcus Braxton responded by handcuffing Skinner and pepper-spraying him in the face when he could not stop coughing on command. Braxton then pushed Skinner's head over a rail and choked him to unconsciousness as Skinner's legs were shackled.

Skinner sued. In discovery, he received Braxton's personnel file. That file reveals that Braxton has repeatedly and wrongfully used force on inmates. In one incident, the Sheriff's Office found that Braxton kicked and punched a handcuffed inmate who was lying on the ground in a fetal position, begging not to be hit. In another incident, the Sheriff's Office determined that Braxton used pepper spray in an inmate's face, withheld medical care from the inmate, and lied to investigators about it. Despite these and other violations, Sheriff Gautreaux retained Braxton on the force.

The Court granted Skinner leave to file an amended complaint adding one new claim: a claim against Sheriff Gautreaux for the improper retention of Deputy Braxton. R. Doc. 66. Sheriff Gautreaux now seeks to dismiss that claim against him on the basis of qualified immunity. R. Doc. 72.

1

The Sheriff's motion should be denied for two reasons. First, the Sheriff's motion should be denied because Plaintiff has alleged a violation of the clearly-established *Gomez* line of cases. Plaintiff has done so by alleging (1) a specific, serious use of unprovoked, excessive force on an inmate; (2) similar to what happened to Plaintiff; (3) that occurred before the incident with Plaintiff; (4) that was sustained; (5) but did not lead to termination or serious deterring punishment.

The Sheriff's motion should also be denied because recent scholarship has brought to light a crucial fact: the original text of Section 1983 contained a "notwithstanding clause" that was later omitted in what became our modern U.S. Code. But the omitted clause still has the force of law – and it directly contradicts the assumption that grounds the doctrine of qualified immunity. The entire doctrine of qualified immunity is premised on the absence of text that we now know <u>is actually present</u>.

For these reasons, Plaintiff asks that Defendant's motion be denied.

**I.      Standard of Review**

Dismissal under Rule 12(b)(6) is disfavored and should be rarely granted. *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982). Under the 12(b)(6) standard, all well-pleaded facts must be viewed in the light most favorable to the plaintiff. *Hale v. King*, 642 F.3d 492, 498-99 (5th Cir. 2011) (*en banc*). Plaintiffs must allege facts that support the elements of the cause of action in order to make out a valid claim. *Id*. Courts generally confine their analysis under Rule 12(b)(6) to the complaint and its proper attachments, which "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Id*., *quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

## II. Analysis

**A. The motion should be denied because the complaint pleads detailed allegations of a violation of clearly established law for the improper retention of Deputy Braxton.**

In his motion, Sheriff Gautreaux acknowledges Fifth Circuit law that an agency "may be held liable for decisions about hiring and retention" if the plaintiff can show "'deliberate indifference' to the known or obvious consequence[s] of such decisions." R. Doc. 72-1 at 7, *quoting Gomez v. Galman*, 18 F. 4th 769, 778 (5th Cir. 2021).

Deliberate indifference exists "where adequate scrutiny of an applicant's background would lead a reasonable supervisor to conclude that the plainly obvious consequences of the decision to [retain] would be the deprivation of a third party's constitutional rights." *Gomez, supra, citing Gros v. City of Grand Prairie*, 209 F.3d 431, 433-34 (5th Cir. 2000), *citing Snyder v. Trepagnier*, 142 F.3d 791, 797 (5th Cir. 1998).

To show deliberate indifference, the connection between the background of the individual and the specific violation alleged must be strong, as the plaintiff "must show that the hired officer was highly likely to inflict the particular type of injury [he] suffered." *Gomez, supra; see also Board of Comm'rs of Bryan Cty. v. Brown*, 520 US 397, 412 (1997).

Sheriff Gautreaux makes several arguments why he believes Plaintiff's improper retention claim should not survive the pleading stage. Each is addressed in turn below:

1. <u>The motion should be denied with regard to the official capacity claim because Plaintiff alleges the personal involvement of Sheriff Gautreaux.</u>

Under *Monell*, a plaintiff asserting a Section 1983 claim against a government entity (like a sheriff in his official capacity) must show "(1) the existence of an official policy or custom, (2) a policymaker's actual or constructive knowledge of the policy or custom, and (3) a constitutional violation where the policy or custom is the 'moving force.'" *Valle v. City of Houston*, 613 F.3d 536, 541–42 (5th Cir. 2010). The existence of an official policy or custom can be proved in several ways. It may be proved via a written policy. Or it can be shown by pointing to a pattern of similar

incidents that, when taken together, reflect the policy of the entity. *Id.* at 547. Under some circumstances, a pattern is not necessary – a single incident is sufficient. *See Canton v. Harris*, 489 U.S. 378 (1989).

But the "policy or custom" prong can be proven in another way also: if "the action of the policymaker itself violated a constitutional right." *Burge v. Par. of St. Tammany*, 187 F.3d 452, 471 (5th Cir. 1999). In if the policymaker *themself* was personally involved with the allegedly illegal action, then it is presumed that the action is policy because it was done by the policymaker.

Here, Sheriff Gautreaux argues that he should not be held liable in his official capacity, because Plaintiff does not plead "a pattern of abuses that transcends the error made in a single case" or facts that would trigger the application of the "single incident exception." R. Doc. 72-1 at 5. But Plaintiff's complaint alleges that Gautreaux <u>himself</u> chose to retain Braxton despite Braxton's misconduct. R. Doc. 67 at ¶ 85 ("Sheriff Gautreaux has retained Braxton on the EBRSO force despite a history of abuse of prisoners, excessive force, false statements, and other misconduct.") Accordingly, it is Sheriff Gautreaux's personal involvement as the final policymaker that satisfies the policy element of *Monell,* not a pattern. As a result, the "single incident" exception to the pattern method of establishing *Monell* is not implicated.

Notably, if Plaintiff has alleged a claim against Sheriff Gautreaux in his official capacity, qualified immunity is not an available defense to that claim. *Gates v. Texas Dept. of Protective & Reg. Services*, 537 F. 3d 404, 436 (5th Cir. 2008) ("governmental entities are not entitled to qualified immunity"), *citing Owen v. City of Independence*, 445 U.S. 622, 657 (1980).

Because Plaintiff alleges Sheriff Gautreaux's personal involvement, the Sheriff's motion should be denied.

2. <u>The motion should be denied because Plaintiff has alleged facts supporting clearly-established deliberate indifference.</u>

As noted above, a government entity can be liable for retaining an officer after incidents that indicate a "proclivity" towards violence. *Gomez v. Galman*, 18 F. 4th 769, 778 (5th Cir. 2021).[1] This theory of liability is not new; it was developed in a series of cases four decades ago. *See, e.g., Turpin v. Mailet,* 619 F2d 196 (2nd Cir. 1980) (allowing *Monell* claim to be premised on failure to discipline); McKenna v. City of Memphis, 785 F.2d 560 (6th Cir. 1986) (jury question of whether city failed to "adequately to discipline . . . its officers"). Generally, to allege this kind of claim, a plaintiff can point to sustained incidents of similar misconduct prior to the misconduct at issue. *Gros v. City of Grand Prairie*, 209 F.3d 431, 433-34 (5th Cir. 2000).

Here, Sheriff Gautreaux argues that Plaintiff has not alleged facts to show "deliberate indifference-that a constitutional violation like the one alleged here is a plainly obvious consequence of any decision to retain Deputy Braxton." R. Doc. 72-1 at 7.

The complaint alleges, however, that prior to the use of force on Plaintiff, a Sheriff's Office investigation "found that Deputy Braxton hit and slammed the inmate to the floor without cause," and that that investigation occurred before Braxton used force on Skinner. R. Doc. 67 at ¶ 95. The EBRSO deputy who witnessed the event described that "Braxton knocked him to the ground and began to kick him and punch him while [the inmate] layed on the ground in a fetal position." *Id.* at ¶ 94. Braxton continued to strike the inmate while the inmate was "beg[ging] Dy. Braxton not to hit him and saying he was sorry" *Id.*

---

[1] Defendant complains that *Gomez* was decided in 2021, after the 2020 facts of this case. R. Doc. 72-1 at 15. But the facts of *Gomez* occurred in 2018. In assessing those 2018 facts, the court in Gomez brought together Supreme Court and Fifth Circuit precedent from 1997, 1998, and 2000. *Gomez,* supra, at 778. Nothing in *Gomez* suggests that it was announcing a new rule. Accordingly, *Gomez* is a good indicator of what was the clearly-established law at the time of the facts of this case. *See Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) ("reasonableness is judged against the backdrop of the law at the time of the conduct.")

But despite that extreme misconduct, Braxton was suspended for only one week. *Id*. at ¶ 97. That is less than the ten-day suspension Braxton received for a first-time incident of sleeping on the job. *Id*. at ¶ 88. Thus, the Sheriff's message to Braxton was clear – even if you commit an act of extreme violence, and even if it is witnessed by another officer, and even if it is reported by another officer, and even if we find that it violated our policy, your punishment will be less severe than a minor issue like your first time sleeping on the job.

Then, in another incident that occurred before the incident with Skinner, Braxton was only suspended for <u>two days</u> despite allowing violence against an inmate to occur. *Id.* at ¶¶ 99-101.

And after Braxton used force on Skinner, another incident occurred. The Sheriff's Office determined that Braxton repeatedly assaulted another inmate and lied about it. Braxton was again suspended for only a week, overriding an explicit recommendation by a high-ranking officer to terminate him. *Id*. at ¶¶ 111-118. Defendants are correct that failure to fire Braxton after this incident cannot be causally linked to Braxton's use of force against Skinner, because it happened afterwards. But it corroborates and makes more plausible the inference that the Sheriff's policy is to allow this kind of conduct by responding with only *de minimis* discipline to even extreme instances of violent misconduct. Indeed, Braxton's subsequent performance review found that he "meets standards" in every category and recommended him for a performance-based pay-raise. *Id*. at ¶¶ 121-122. (The fact that EBRSO determined that Braxton assaulted an inmate, withheld medical care, and lied about was not even *mentioned* in his performance review. *Id.*)

Thus, Braxton showed a clear proclivity for violence when he kicked and punched an inmate who was lying on the ground in a fetal position begging Braxton to stop. He showed a further tolerance for violence when he failed to stop an inmate from being assaulted. And the Sheriff's response – retaining Braxton on the force, not reassigning him, and giving him an extremely minor punishment – made it highly likely that Braxton would do it again. Braxton did in fact do it again, multiple times. And he is *still* on the EBRSO force, still interacting with inmates.

6

Thus, Plaintiff has alleged (1) a specific, serious use of unprovoked, excessive force on an inmate; (2) similar to what happened to Plaintiff; (3) that occurred before the incident with Plaintiff; (4) that was sustained; (5) but did not lead to termination or serious deterring punishment. The allegations therefore more than meet the clearly-established caselaw of *Gros*, *Gomez*, and similar cases.

3. <u>The motion should be denied because Plaintiff has alleged facts supporting Gautreaux's personal involvement.</u>

Regarding personal involvement, "at the pleading stage, allegations of 'tacit approval of, acquiescence in, or purposeful disregard of, rights-violating conduct' will defeat a motion to dismiss predicated on Rule 12(b)(6)." *Cleveland v. Gautreaux*, 198 F.Supp.3d 719, 739-40 (M.D. La. 2016). *See also Rochester v. Warden,* 17-cv-1220 (M.D. Pa., Sept. 5 2017) (personal involvement "can be shown through allegations of personal direction or of actual knowledge and acquiescence."), *quoting Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

At the motion to dismiss phase, there is a low bar for the sufficiency of such allegations. Allegations of personal involvement must only be "facially plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). That is to say, they must only rise above the "speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007). *See White v. Officer X*, 11-cv-2926 (E.D. La., Dec. 20, 2012) (requiring only facial plausibility for allegations of personal involvement.

For example, in *Jackson v. Tanner,* 17-cv-13503 (E.D. La., Aug. 18, 2021), it was sufficient that a plaintiff alleged that the top supervisory official "had a duty to train and supervise its employees and that he failed to train" them, and that the "failure to train and supervise was both a tacit approval of, or acquiescence in, his subordinates' conduct and a repudiation of Plaintiff's rights such that Tanner was a moving force behind the constitutional violations." The court concluded that at the "pleading state, these allegations are at least minimally sufficient to defeat a

motion to dismiss predicated on Rule 12(b)(6)." *Id.*, *citing Cleveland v. Gautreaux*, 198 F.Supp.3d 719, 739-40 (M.D. La. 2016).

Here, Sheriff Gautreaux seeks dismissal of the individual capacity claim against him on the theory that Plaintiff has not alleged facts that Gautreaux was aware of Braxton's disciplinary background or personally involved in the decision to retain Braxton. R. Doc. 72-1 at 14.

But Plaintiff has alleged exactly that. He alleges that "Sheriff Gautreaux has retained Braxton on the EBRSO force despite a history of abuse of prisoners, excessive force, false statements, and other misconduct." R. Doc. 67 at ¶ 85. For each example of Braxton's misconduct, the complaint alleges that Gautreaux retained him "despite" that misconduct. *Id.* at ¶ 89, 98, 116, 119, 121, 123. (The word "despite" implies a choice in the face of personal knowledge.) The complaint also alleges specific facts indicating that Gautreaux is personally involved in personnel decisions. For example, the complaint alleges that on "June 29, 2020, Sheriff Gautreaux signed a promotion letter promoting Braxton from Corporal to Sergeant." *Id.* at 110. It is highly unlikely that Sheriff Gautreaux is personally involved with personnel decisions *only* for promotions but *not* for discipline.[2] These allegations are far more detailed than the more-conclusory allegations of *Jackson*.

And other cases corroborate Gautreaux's personal knowledge of deputy disciplinary history. For example, in *Mitchell v. Gautreaux,* plaintiffs alleged that "Gautreaux, through his deputies, further told Petitioners that said deputy had a history of prior complaints and prior disciplinary history involving assaulting others. . . ." 16-cv-722-SDD-EWD (M.D. La., May 30, 2017). And *Bellard v. Gautreaux,* there was testimony that Gautreaux discussed employee discipline with other employees. 08-cv-627 (M.D. La., Dec. 1, 2010) ("A: He definitely

---

[2] It is outside the pleadings, but Sheriff Gautreaux also personally signed Braxton's appointment papers, personally signed memos providing Braxton with service pins, and was cc:ed on letters of commendation. Ex. B. It defies plausibility that Sheriff Gautreaux is involved in human resources issues on such a granular level but had no knowledge whatsoever of deputy discipline.

8

acknowledged having spoken to the Sheriff and heard about my termination. Q; Who did he hear about your termination from? A: He indicated that he had spoken to the Sheriff.")

For these reasons, Plaintiff's complaint has brought a facially plausible allegation that Gautreaux was personally involved in Braxton's retention.

**B.     The motion should be denied because the doctrine of qualified immunity is contrary to the Notwithstanding Clause of the original text of Section 1983.[3]**

1. <u>The original version of Section 1983 contained a "Notwithstanding Clause" that does not appear in today's U.S. Code.</u>

When Congress passes new legislation, it "does not write upon a clean slate." *United States v. Texas*, 507 U.S. 529, 534 (1993). Rather, it legislates against a backdrop of established "common law adjudicatory principles." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991). When Congress decides to craft a new law, it has a choice to make about the common law: it can either retain or reject the "long-established and familiar principles" in the common law. *Texas*, *supra*, 507 U.S. at 534. Courts assume that Congress chose to retain the common law unless the text of the statute says otherwise. *Norfolk Redevelopment & Hous. Auth. v. Chesapeake & Potomac Tel. Co. of Va.*, 464 U.S. 30, 35–36 (1983). It is thus the statutory text that decides whether common-law principles survive and apply to any particular statute.

The statute at issue here is Section 1983. Starting in 1967, the Supreme Court has assumed that Congress intended to retain common-law principles in actions under Section 1983. *Pierson v. Ray*, 386 U.S. 547, 557 (1967) ("We hold that the defense of good faith and probable cause, which

---

[3] This section relies substantially on the recent scholarship of Professor Alexander A. Reinert, as reflected in his forthcoming article *Qualified Immunity's Flawed Foundation*, 111 Calif. L. Rev. 101, 166-67. That article is available online at https://tinyurl.com/QI-Flawed-Fnd.

This section also relies on the research and briefing of the Institute for Justice, as reflected in its amicus brief in the currently-pending U.S. Supreme Court case *Health and Hospital Corporation of Marion County v. Talevski,* 21-806. That amicus brief is available online at
https://www.supremecourt.gov/DocketPDF/21/21-806/238607/20220923085926238_21-806%20Amicus%20Brief%20of%20Institute%20for%20Justice.pdf

the Court of Appeals found available to the officers in the common-law action for false arrest and imprisonment, is also available to them in the action under § 1983"). In *Pierson,* the Supreme Court reviewed the version of Section 1983 found in the U.S. Code (*id.,* fn. 1), and concluded that the "legislative record gives no clear indication that Congress meant to abolish wholesale all common-law immunities" (*id.* at 554). Accordingly, the Court granted defendants a "defense of good faith and probable cause" that existed in Mississippi's common law. *Id.* at 557.

That assumed-to-be-incorporated "good faith" defense evolved into the modern doctrine of qualified immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800, 806-807 (1982) ("As recognized at common law, public officers require this protection to shield them from undue interference with their duties and from potentially disabling threats of liability.")[4] And with each step along the path of qualified immunity, the Supreme Court has explicitly relied on the supposed silence of Section 1983 to ground the doctrine.[5]

---

[4] More recent scholarship has cast doubt on whether there actually was any generally available defense of good faith for constitutional claims or common law torts in 1871. *See* Baude, *Is Qualified Immunity Unlawful?*, 106 Cal. L. Rev. 45, 55-57 (2018); Schwartz, Joanna C., *The Case Against Qualified Immunity*, 93 Notre Dame L. Rev. 1797, 1801-1802 & nn.24- 26 (2018). And there is a growing cross-ideological body of criticism of the doctrine generally. *See, e.g., Ziglar v. Abbasi*, 137 S. Ct. 1843, 1870 (2017) (Thomas, J., concurring in part and concurring in the judgment) (noting his "growing concern with our qualified immunity jurisprudence."); *Kisela v. Hughes*, 138 S. Ct. 1148, 1162 (2018) (Sotomayor, J., dissenting) (criticizing the Court's "one-sided approach to qualified immunity [which] transforms the doctrine into an absolute shield for law enforcement."). This brief does not rely on such doubt.

[5] *See, e.g., Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993) (holding that "[c]ertain immunities were so well established in 1871" that "Congress would have specifically . . . provided had it wished to abolish them."); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 67 (1989) (relying on the presumption that the 42nd Congress "likely intended" for the common law to apply); *Briscoe v. Lahue*, 460 U.S. 325, 337 (1983) ("[W]e find no evidence that Congress intended to abrogate the traditional common-law witness immunity in § 1983 actions."); *Procunier v. Navarette*, 434 U.S. 555, 561 (1978) ("Although the Court has recognized that in enacting §1983 Congress must have intended to expose state officials to damages liability in some circumstances, the section has been consistently construed as not intending wholesale revocation of the common-law immunity afforded government officials."); *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976) ("The decision in *Tenney* established that §1983 is to be read in harmony with general principles of tort immunities and defenses, rather than in derogation of them."). For a more thorough treatment of the evolution of the doctrine of qualified immunity, *see* Reinert, *supra*, at 115 et seq.

But the Supreme Court was wrong when it assumed that Congress intended to incorporate the common law in Section 1983. The Supreme Court got it wrong because the version of Section 1983 the Court looked at – the U.S. Code – <u>omits language originally passed by Congress</u>.

To see how, we have to go back to the origin of Section 1983.[6] The 42nd Congress passed Section 1983 as part of the Ku Klux Klan Act of 1871. The original text of the statute was reflected in the Statutes at Large. That original version was longer than its contemporary U.S. Code counterpart. Rather than having just <u>two</u> relevant clauses, the original text had <u>three</u>. The first and the third clauses are largely the same today as they were in 1871:

> That any person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall
>
> . . . be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress[.]

Ku Klux Klan Act of 1871, ch. 22, § 1, 17 Stat. 13 (1871).

The original statute, however, contained "additional significant text" where the ellipsis appears above –"[i]n between the words 'shall' and 'be liable.'" *See* Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Calif. L. Rev. 101, 166-67 (forthcoming).

Between "shall" and "liable" was an additional clause. That clause said that government officials "shall, **any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding**, be liable" under the statute. Ku Klux Klan Act of 1871, ch. 22, § 1, 17 Stat. 13 (1871) (emphasis added). That language can be seen highlighted below in an authentic copy of the Civil Rights Act of 1871, certified by the National Archives and Records Administration on August 19, 2022. See Ex. A, and below.

---

[6] Section 1983 has had many homes. It was originally located in the U.S. Statutes at Large of 1871-1873, ch. 22, § 1, 17 Stat. 13. It then moved to Section 1979 of the U.S. Revised Statutes (1878), then again to 8 U.S.C. § 43 (1925), and finally to 42 U.S.C. § 1983 (1952). This brief uses "Section 1983" to include this entire history.

11

# Congress of the United States, At the First Session,

Begun and held at the CITY OF WASHINGTON, in the DISTRICT OF COLUMBIA, on Saturday the fourth day of March, eighteen hundred and seventy-one.

Twenty-second

**AN ACT** to enforce the provisions of the fourteenth amendment to the Constitution of the United States, and for other purposes.

Be it Enacted, by the Senate and House of Representatives of the United States of America in Congress assembled, That any person who, under color of any law, statute, ordinance, regulation, custom, or usage, of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress; such proceeding to be prosecuted in the several district or circuit courts of the United States, with and subject to the same rights of appeal, review upon error, and other remedies provided in like cases in such courts, under the provisions of the act of the ninth of April, eighteen hundred and sixty-six, entitled "An act to protect all persons in the United States in their civil rights, and to furnish the means of their vindication," and the other remedial laws of the United States which are in their nature applicable in such cases.

Sec. 2. That if two or more persons within any State or Territory of the United States shall conspire together to overthrow, or to put down, or to destroy by force the Government of the United States, or to levy war against the United States, or to oppose by force the authority of the Government of the United States, or by force,

What does this long-forgotten "Notwithstanding Clause" mean? To determine that, this Court should look to the "ordinary public meaning" of the Notwithstanding Clause "at the time of its enactment." *See Bostock v. Clayton County*, 140 S. Ct. 1731, 1738 (2020). Accordingly, the Court should evaluate two key phrases: (1) "custom[ ] or usage of the State," and (2) "to the contrary notwithstanding."

As understood by the 42nd Congress, a "usage or custom" was the common law itself. *Strother v. Lucas*, 37 U.S. 410, 437 (1838). Whether a rule was established by "usage" or through "custom," it existed by "a common right, which means a right by common law." *Id.*; *see also Wheaton v. Peters*, 33 U.S. (8 Pet.) 591, 659 (1834) ("The judicial decisions, the usages and customs of the respective states" established the "common law . . . in each [state]."); *Western Union Telegraph Co. v. Call Pub. Co.,* 181 U.S. 92, 102 (1901) (citing Black's Law Dictionary for proposition that common law springs from "usages and customs").[7]

The original text of Section 1983 also said that officials will be liable for constitutional violations "notwithstanding" any "contrary" common-law principles. The ordinary public meaning of "notwithstanding" remains that same today as it did for the 42nd Congress in 1871. *See Bryan A. Garner, Garner's Modern English Usage* 635 (4th ed. 2016) ("This usage [of notwithstanding] has been constant from the 1300s to the present day."). "Notwithstanding" means "[w]ithout opposition, prevention, or obstruction from," or "in spite of." Complete Dictionary of the English

---

[7] The legislative history of Section 1983 confirms this common understanding of "custom and usage" from 1871. For example, "Senator Thurman, speaking in opposition to Section 1 of the 1871 Act (what is now Section 1983), clearly understood that 'custom or usage' was equivalent to 'common law.'" *Reinert*, 111 Calif. L. Rev. at 167. In fact, while expressing his concern over "how comprehensive [the statute's] language is," Senator Thurman was alarmed that an official could be liable for any "deprivation under color of law," which, in his words, included any "'custom or usage' which has become common law." Cong. Globe, 42d Cong., 1st Sess., App. 217 (1871) (available online at https://memory.loc.gov/cgi-bin/ampage?collId=llcg&fileName=100/llcg100.db&recNum=354). So Senator Thurman, understood that when the 42nd Congress used the phrase "custom[ ] or usage of the State," it meant the common law of each state.

13

Language 894 (Webster's 1886)[8]; *NLRB v. SW Gen., Inc*., 137 S. Ct. 929, 939 (2017) (explaining that the ordinary meaning of "notwithstanding" is "in spite of" or "without prevention or obstruction from or by"). Many contemporaneous dictionaries confirm this meaning. *See, e.g., Etymological Dictionary of the English Language* 344 (Chambers's 1874) ("not standing against or opposing; nevertheless.");[9] 2 A New Dictionary of the English Language 1351 (1837) ("Not opposing, resisting, hindering, preventing.").[10] This plain-English understanding of the "Notwithstanding Clause" is consistent with the context. As Reinert observes, some "the very same people who served in the rebel army were also serving as judges in southern states. It would have been passing strange, then, for the very same Congress to permit liability under Section 1983 to be limited by judge-made law created by state court judges." *Reinert*, 111 Calif. L. Rev. at 175.

<u>In short</u>: the Notwithstanding Clause means that the common law does <u>not</u> prevent persons from being held liable under Section 1983. *See id.* at 167–68 ("Its implications are unambiguous: state law immunity doctrine, however framed, has no place in Section 1983.").

2. <u>The removal of the Notwithstanding Clause in the Revised Statutes of 1874 did not change the substance of the law.</u>

In determining what a law says, the current edition of the United States Code is "prima facie" evidence of the text of the law. *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.,* 508 U.S. 439, 448 (1993), *citing* 1 U. S. C. § 204(a). But it is the original Statutes at Large that provides the actual "legal evidence of laws." *Id., quoting* 1 U. S. C. § 112; *see also United States v. Welden*, 377 U.S. 95, 98 n.4 (1964) ("the Code cannot prevail over the Statutes at Large when the two are inconsistent."), *quoting Stephan v. United States*, 319 U.S. 423, 426 (1943).

Relevant here, shortly after passing the Ku Klux Klan Act of 1871, the 43rd Congress compiled the Revised Statutes of 1874. Before the Revised Statutes, the country lacked an official

---

[8] Available online at https://archive.org/details/websterscomplete00webs/page/894/mode/2up?view=theater
[9] Available online at https://i2i.org/wp-content/uploads/2017/11/1874_Chambers_Etymological.pdf
[10] Available online at https://babel.hathitrust.org/cgi/pt?id=chi.73004154&view=1up&seq=175

compilation of federal laws. Lawyers often found themselves relying on newspapers or private compilations to even know what the law was. Ralph H. Dwan & Ernest R. Feidler, *The Federal Statutes—Their History and Use*, 22 Minn. L. Rev. 1008, 1008–09 (1938). To address this, "President Andrew Johnson appointed a commission to revise, simplify, arrange, and consolidate all statutes of the United States." Shawn G. Nevers & Julie Graves Krishnaswami, *The Shadow Code: Statutory Notes in the United States Code*, 112 L. Library J. 213, 218 (2020) (internal quotation marks omitted). At its core, this compilation was organizational in design – just putting all existing federal laws in the same place for the first time.

But after years of trying, Congress wasn't satisfied with the results. Dwan & Feidler, 22 Minn. L. Rev. at 1013. It hired Thomas Jefferson Durant, a D.C. lawyer not involved in the initial drafting, to comb through the proposed revisions. 2 Cong. Rec. 646 (1874). Congress tasked Durant to strike out any provision that substantively changed the law, but to keep "mere changes of phraseology not affecting the meaning of the law." *Id*. at 646, 648. For the latter, Congress understood that some changes had to be made. After all, it would be impossible to "condense seventeen volumes into one and use precisely the same words that have been used in those seventeen." *Id*. at 1210 (remarks of Rep. Poland); *see also id.* at 650 (remarks of Rep. Lawrence) (same). This meant that some language would be "necessarily changed." *Id*. But that said, Congress intended "to preserve absolute identity of meaning" in the law. 2 Cong. Rec. 4220 (1874) (Sen. Conkling). Indeed, as one representative stressed, "We have not attempted to change the law, in a single word or letter, so as to make a different reading or different sense." 2 Cong. Rec. 129 (1873). Rather, when a change was made, that change, "however minute," was simply meant to miniaturize and condense the law. 2 Cong. Rec. 4220 (1874). This was true for omissions, too, which the 43rd Congress viewed as a necessary tool "to strike out the obsolete parts and to condense and consolidate." 2 Cong. Rec. 129 (1873). Such an omission did not, however, substantively change the law.

Durant's revisions were passed by the 43rd congress as the Revised Statutes in 1874, which later became the U.S. Code. But because the explicit intent of congress was to <u>not</u> change the substantive provisions of the law, the omission of the Notwithstanding Clause in 1874 did not alter the 42d Congress's original decision to abrogate the common law from Section 1983. *See United States v. Welden*, 377 U.S. 95, 98 fn.4 (1964) (when Congress decides to "revis[e] and consolidat[e] the laws," it does not change the effect of the law unless Congress explicitly says so.)

This approach matches the Court's presumption against implicit statutory changes. When Congress wants to repeal or change some part of a statute, it must do so with "clear and manifest" intent. *See Watt v. Alaska*, 451 U.S. 259, 266–67 (1981). In other words, to incorporate the common law back into Section 1983, the Revised Statues would have needed to include some form of positive text about the common law. *See* Reinert, 111 Calif. L. Rev. at 169–71 (ex- plaining that the removal of the Notwithstanding Clause was "not the product of any positive lawmaking"). But that addition to the text never happened.[11] The Revised Statutes did not mention the common law. Nor did the 43rd Congress include language indicating that it was reversing the 42nd Congress's decision to excise the common law from Section 1983.

It makes sense, then, that the U.S. Supreme Court has already viewed the omission of two other Notwithstanding Clauses from other civil rights statutes as non-substantive changes to the law. *See Jones v. Alfred H. Mayer Co*., 392 U.S. 409, 422 (1968); *The Civil Rights Cases*, 109 U.S. 3, 16–17 (1883). In *Jones*, for example, the Supreme Court viewed the omission of another Notwithstanding Clause – in Section 1982 – as a non-substantive change. *Jones, supra,* 392 U.S.

---

[11] There have been only two amendments to 42 U.S.C. §1983 over the course of the 151 years since its enactment. The first amendment, Pub. L. 96-170, §1, enacted on December 29, 1979, made certain that the District of Columbia was covered by 42 U.S.C. §1983. The second amendment, Pub. L. 104-317, title III, §309(c), addresses the availability of injunctive relief in cases against judicial officers.

at 422 n.29. The Court recognized that the Section 1982 Notwithstanding Clause was "obviously inserted" to "emphasiz[e] the supremacy of the 1866 statute over inconsistent state or local laws." *Id*. And later, when "[i]t was deleted" in the Revised Statutes, the Court presumed the omission was just a decision to remove perceived "surplusage." *Id*.

So too with Section 1983. The 1871 Congress was explicit in legislating that persons can be held liable for Section 1983 violations in spite of any common law doctrines to the contrary. The omission of that language in 1874 did not change the impact of the law. The doctrine of qualified immunity rests on the presumption that the 1871 statute was silent about the common law. But the statute was <u>not</u> silent – it explicitly rejected any common law defenses. Because the original text of the statute shows that the presumption was wrong, this Court should deny the application of qualified immunity here as Congress intended.

### III. Conclusion

For the reasons above, Plaintiff asks that this Court deny Sheriff Gautreaux's motion to dismiss.

Respectfully submitted,

*/s/ William Most*
William Most, No. 36914
Most & Associates
201 St. Charles Ave., Ste. 114, # 101
New Orleans, LA 70170
T: (504) 509-5023
williammost@gmail.com

*Attorney for Plaintiff*
